UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| RONALD WILLARD, | ) | |
|---|---|---|
| | ) | Case No. 1:20-cv-125 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Christopher H. Steger |
| UNUM LIFE INSURANCE COMPANY OF AMERICA, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**MEMORANDUM OPINION**

Before the Court are Plaintiff Ronald Willard's motion for judgment on the administrative record (Doc. 67), Willard's objection to the magistrate judge's order sealing information (Doc. 58), Willard's motion to seal its proposed motion to determine the extent of deference (Doc. 65), and Defendants Unum Life Insurance Company of America and Unum Group Corporation's (collectively, "Unum") motion to strike (Doc. 69). For the following reasons, the Court will **GRANT** Willard's motion for judgment on the administrative record, **OVERRULE** Willard's objection to the magistrate judge's order, and **DENY AS MOOT** Willard's motion to seal and Unum's motion to strike.

I. **BACKGROUND**

A. **The Policy**

Willard worked as a production supervisor at Amcor Flexibles, LLC ("Amcor") until March 19, 2019. Amcor carries a long-term disability-insurance policy ("the Policy"), which Unum issued and administered. (Doc. 18, at 42–90.) The Policy states that an individual is

disabled when: "[he is] limited from performing the material and substantial duties of [his] regular occupation due to [his] sickness or injury; and [he has] as 20% or more loss in [his] indexed monthly earning due to the same sickness or injury." (*Id.* at 57.) The Policy defines "regular occupation" as "the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." (*Id.* at 77.) Unum initially found Willard's occupation in the national economy to be consistent with Production Supervisor, which requires exertion up to twenty pounds, frequent sitting and occasional standing and walking, and frequent handling and fingering. (*Id.* at 175.) A vocational rehabilitation specialist for Unum, however, later updated the material duties of the position to also include frequent standing and walking during the workday. (*Id.* at 765–67.) The Policy also "delegates to Unum . . . discretionary authority to make benefit determinations under the Plan." (*Id.* at 85.)

### B. Willard's Medical History

Willard was diagnosed with ankylosing spondylitis ("AS") in 2004. (*Id.* at 606.) Due to this condition, he has had chronic pain for over fifteen years and, in 2019, was experiencing pain in all of his joints and in his lower back. (*Id.* at 128.) He has received treatment from his rheumatologist, Dr. Steven Kenzer, since April 2015. (*Id.* at 606.) At every appointment with Dr. Kenzer since 2015, Willard complained of persistent pain in his back and joints, especially his hips and knees, and Dr. Kenzer consistently noted Willard had decreased range of motion in his hips and spine. (*Id.* at 606–46.) These observations were confirmed with positive Schober's Tests, a diagnostic which measures the lumbar flexion and confirms a diagnosis of AS. (*Id.* at 637, 641, 645, 732.) His pain increased and decreased in severity throughout the years, reaching

2

as low as a three out of ten in severity in April 2016, and as high as a nine out of ten in April and December 2017. (*Id.* at 612, 638, 642.) Willard takes medications and has received cortisone injections, but his pain persists, and he does not have further treatment options. (*Id.* at 128.)

On December 16, 2018, Willard missed work without contacting his employer due to a two-day "bender" with cocaine. (*Id.* at 306.) He informed his employer that he had a substance-abuse problem and asked for help. (*Id.*) This resulted in his filing a short-term disability claim, and soon after returning to work the week of January 20, 2019, under a return-to-work agreement between him and Amcor and authorized by his substance-abuse therapist. (*Id.* at 315–19.)

On March 8, 2019, Willard visited Dr. Kenzer's office. (*Id.* at 225.) At the appointment, Willard complained of pain in his hips and knees, describing the pain as "sharp in quality" and "a 6 out of 10 in severity." (*Id.*) Dr. Kenzer noted at the visit that the pain was relieved with rest and with the intravenous administration of an infusion of the drug Remicade, which Willard received every six weeks. (*Id.*) At the visit, Dr. Kenzer administered steroid injections to both knees and prescribed an increase in Remicade dosage. (*Id.* at 229.) In assessing Willard's musculoskeletal health, Dr. Kenzer wrote that Willard had normal range of motion and strength in his upper extremities. (*Id.* at 229.) However, in Willard's lower extremities, Dr. Kenzer noted "[p]rofoundly decreased internal range of motion in right hip. Left hip has moderate decreased range of motion. Bilateral knee crepitus with decreased range of motion. No synovitis. Normal strength." (*Id.* at 229.) Further, in his spine, Willard had "[d]ecreased cervical range of motion." (*Id.*) These observations were confirmed with positive Schober's Tests. (*Id.* at 229, 378.) He noted no other associated symptoms or complaints at that visit. (*Id.* at 225.) Willard later told Unum Disability Benefits Specialist Carson Gilliam that, during the March 8, 2019, appointment, he and Dr. Kenzer discussed "taking him out of work permanently in the future," but he still

3

wanted to think about it some more. (*Id.* at 284.) However, Dr. Kenzer's notes from the appointment do not include any discussion regarding Willard's ability to work. (*Id.* at 225–36.)

C. **Willard's Disability Claim**

Ten days later, on March 18, 2019, Willard called Dr. Kenzer's nurse and advised that he thought it was a good time for him to be taken off work. (*Id.*) After the overnight shift that same evening, Willard received a call notifying him that he was being terminated for violating the return-to-work agreement he entered after his substance-abuse-related short-term disability leave. (*Id.*; Doc. 18-1, at 79.) On March 22, 2019, Willard filed a short-term disability claim due to his AS. (Doc. 18-1, at 19.) Unum approved the short-term benefits and paid them for the twenty-six-week maximum term under Amcor's short-term disability insurance. (*Id.* at 161.) In August 2019, about a month before the short-term benefits ended, Unum notified Willard that his claim would be transferred into a long-term disability claim, that just because he was approved for short-term benefits did not mean he would be automatically eligible for long-term disability benefits, and that Unum would begin a review of his claim. (*Id.*)

Benefits Specialist Gilliam contacted Willard on August 22, 2019. (Doc. 18, at 127–133.) During the call, Willard reported to Gilliam that he had not missed time due to his AS prior to his last day of work. (*Id.* at 127.) During this conversation, he reported that he does not do a lot of daily activities, but he could do his laundry and grocery shopping without experiencing problems. (*Id.* at 130.) He had recently moved back home with his parents, who did most of the upkeep for him. (*Id.*) He reported he could not play golf or do "anything really physical" anymore. (*Id.*) Driving was also difficult because he could not turn his neck very well. (*Id.*) He was able to keep up with other activities, such as occasionally swimming and going out to dinner. (*Id.*)

4

On August 28, 2019, Gilliam, Director Meg Murray, Clinical Consultant Amy Oliver, and Vocational Rehabilitation Consultant Deborah Nix held a forum discussion to identify next steps in the review of Willard's claim. (*Id.* at 175.) Under the terms of the Policy, Nix identified the material and substantial duties of Willard's regular occupation in the national economy to be consistent with those of a "Production Supervisor"—light exertion up to 20 pounds occasionally, frequent sitting, occasional standing and walking, and frequent handling and fingering. (*Id.*)

Oliver performed a file review on Willard's claim on September 25, 2019. Oliver determined that Willard was, in fact, able to perform the functional demands of his occupation because: (1) he had only seen Dr. Kenzer once since his March 18, 2019, date of disability; (2) his treatment plan had not changed in over a year; (3) Willard's symptoms and complaints were not documented as worsening; (4) he did not make any new requests for medications; and (5) the physical examination findings remained unchanged for about a year. (*Id.* at 290.) Oliver therefore recommended bringing the file to forum and having an onsite physician review the claim. (*Id.* at 290.)

Unum referred the file to onsite physician Dr. Jennifer Ju, who is board-certified in family medicine. After reviewing the file, Dr. Ju opined that the medical evidence did not support finding Willard to be disabled under the Policy. (*Id.* at 335.) However, she wrote a letter to Dr. Kenzer on September 30, 2019, stating her opinion based on the preliminary review of the file and inviting Dr. Kenzer to agree or disagree and share his medical rationale for any disagreement for her to further evaluate. (*Id.*) Dr. Kenzer responded and disagreed with Dr. Ju's opinion that Willard would be able to engage in frequent reaching and exerting up to twenty pounds of force and noted that Willard is in chronic pain. (*Id.* at 340.) In the space where Dr. Kenzer was directed to provide the medical rationale for this disagreement, he wrote, "[f]eel free

to have the patient have a functional disability assessment by your physicians." (*Id.* at 340.)

The Policy specifies, "[w]e may require you to be examined by a physician, other medical practitioner and/or vocational expert of our choice. Unum will pay for this examination." (Doc. 18, at 400.) Unum issued a letter to Willard on August 27, 2019, which advised him of his right to request an independent medical examination:

> Our evaluation of your medical restrictions and limitations includes a review of your medical records. As we perform our review of your claim, it is your right, or the right of your attending physician, either directly or through your representative, to request an "independent medical examination" (IME) should opinions differ on the degree of medical impairment. Any such request will be evaluated under our IME protocol and guidelines including consideration of whether our decision is related to your medical condition. We will consider your request in a timely manner and provide you with our response in writing.

(*Id.* at 170.) Despite Dr. Kenzer's suggestion to perform an examination, Unum did not conduct an independent medical examination or respond to Dr. Kenzer's request; its decisions were based entirely on file reviews.

On October 17, 2019, Dr. Ju completed her review, in which she concluded that Willard was not disabled within the meaning of the Policy, because: (1) he engaged in his duties full time without missing days since before the date of disability and with physical exam findings that were unchanged; (2) although Dr. Kenzer said in his October 2, 2019 response that Willard cannot perform frequent reaching and exerting force, his treating notes from August 6, 2019, note normal strength and range of motion in his upper extremities; (3) medical management remained stable, with no imaging studies, referrals to specialists, or physical therapy; (4) since leaving work in March 18, 2019, Willard was examined by Dr. Kenzer only one other time in 2019, some five months later on August 6, 2019, with no intervening treatment noted; and (5) Willard reported the ability to perform activities of daily living, such as doing laundry, grocery shopping, and driving, all of which are consistent with functional capacity to perform his

6

occupational demands. (*Id.* at 370–372.)

Unum's Designated Medical Officer Dr. Norman Bress, who is a board-certified rheumatologist, also reviewed Willard's file. (*Id.* at 377–80.) Dr. Bress agreed with Dr. Ju because: (1) there was no change in the treatment program at or around Willard's last day of work; (2) Willard was able to drive, an indication that he did not have severely decreased range of motion in his spine; and (3) Willard was able to work full-time prior to his last day of work and there is no evidence of a flare-up at or around that time. (*Id.* at 379–80.)

### D. Claim Denial and Appeal

Unum issued a letter dated October 25, 2019, denying Willard's claim for long-term disability benefits. (*Id.* at 397.) With the assistance of counsel, Willard filed a timely written appeal and submitted additional evidence in support of his claim. (*Id.* at 438–84.) This additional evidence included various medical-work-excuse notes Dr. Kenzer issued to Willard between October 21, 2016, and March 18, 2019. (*Id.* at 513–34). The notes did not specify for what medical condition Willard had missed work. (*Id.*) He also submitted a vocational report by Certified Rehabilitation Counselor and Vocational Assessment Specialist, Andrea Bradford. (*Id.* at 525–37.) The report opined that Willard would typically be able to perform the requirements of his position but would still need three to five days of absences per month due to flare ups. (*Id.* at 536.) Because these absences would likely not be accommodated, Bradford opined that Willard was disabled within the meaning of the Policy. (*Id.*) Willard also submitted additional medical records from Dr. Kenzer. (*Id.* at 539–712).

On appeal, a different clinical consultant, on-site physician, and vocational rehabilitation specialist from the initial claim review each reviewed Willard's file. (*Id.* at 725–26.) Each of these file reviewers opined that Willard was not disabled within the meaning of the Policy. (*Id.*

at 729–36; 739–42; 765–67.) The appeals file reviewers based these opinions on substantially the same bases as Dr. Ju and Dr. Bress. (*Id.*) Particularly, they noted that there were no changes in physical exam findings around the last day of work, Willard had been working full time without issues, the intensity of treatment after the last day of work was not consistent with a flare-up, and Willard could perform light-intensity daily activities. (*Id.*) The appellate vocational rehabilitation specialist did, however, amend the material duties of Willard's position to include frequent standing and walking and occasional crouching, rather than frequent sitting with only occasional standing and walking. (*Id.* at 765–67.) Nonetheless, Unum upheld its denial on appeal and issued the decision on May 7, 2020. (*Id.* at 808–15.) Willard filed this action on May 20, 2020, alleging a single claim: failure to provide disability benefits due in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. (Doc. 1.) Willard has moved for judgment on the ERISA record, and its motion is ripe for the Court's review.

## II. MOTION FOR JUDGMENT ON THE ERISA RECORD

### A. Standard of Review

Under ERISA, when a policy contains a clear and express grant of discretion to the administrator of the policy, the court will not overturn the administrator's decision unless that decision is arbitrary and capricious. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The Policy in this case contains such a grant of discretion, and both parties agree that the arbitrary-and-capricious standard applies. (Doc. 68, at 161; Doc. 74, at 12.)

Under the arbitrary-and-capricious standard, the administrator's decision must stand "if it is 'the result of a deliberate principled reasoning process' and 'supported by substantial

8

evidence.'" *Shaw v. AT&T Ben. Umbrella Plan No. 1*, 795 F.3d 538, 547 (6th Cir. 2015) (quoting *DeLisle v. Sun Life Assur. Co. of Can.*, 558 F.3d 330, 444 (6th Cir. 2009)). In short, if the administrator can offer a reasonable explanation as to its decision, the decision is not arbitrary and capricious. *Id.* The Court, however, is not required to blindly accept the decision of an administrator. "[A]rbitrary-and-capricious review is not a rubber stamp." *Id.* (quotation marks omitted) (quoting *Cox v. Standard Ins. Co.*, 585 F.3d 295, 302 (6th Cir. 2009)). Instead, the Sixth Circuit has outlined several factors to consider:

> "[T]he quality and quantity of the medical evidence"; the existence of any conflicts of interest; whether the administrator considered any disability finding by the Social Security Administration; and whether the administrator contracted with physicians to conduct a file review as opposed to a physical examination of the claimant.

*Fura v. Fed. Exp. Corp. Long Term Disability Plan*, 534 F. App'x 340, 342 (6th Cir. 2013) (quoting *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 552–53 (6th Cir. 2008)); *see also Shaw*, 795 F.3d at 547 (discussing the same factors). Furthermore, in analyzing Unum's decision, the court is limited to the facts "known to the plan administrator at the time he made his decision." *Yeager*, 88 F.3d at 380.

### B. Analysis

Willard argues he is disabled under the Plan and that Unum's denial of long-term disability benefits was arbitrary and capricious because Unum: (1) refused to have Willard physically examined, (2) relied on its in-house file reviewer's credibility determinations, (3) relied exclusively on doctors in its own employ to deny Willard's claim, and (4) failed to meaningfully evaluate the medical evidence.

#### i. *Examination*

Courts in this circuit consider failure to conduct a physical examination in favor of a file review as a factor in determining whether a plan administrator acted arbitrarily in denying

9

benefits. *E.g.*, *Fura*, 534 F. App'x at 342; *Bennett*, 514 F.3d at 552–53; *Shaw*, 795 F.3d at 547. "[R]eliance on a file review does not, standing alone, require the conclusion that [the plan administrator] acted improperly," but "may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295–96 (6th Cir. 2005) (finding "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," but that in this case, the file review was clearly inadequate because it was not based on a reasoned or rational reading of the record before it). "Generally, the Sixth Circuit has found a file-only review arbitrary and capricious where there was significant objective medical data in the record to support a disability or where the reviewer did not adequately consider the record." *Gilrane v. Unum Life Ins. Co. of Am.*, No. 1:16-CV-403, 2017 WL 4018853, at *8 (E.D. Tenn. Sept. 12, 2017) (collecting cases) (citations omitted).

A file review may be discredited if "the file reviewer concludes that the claimant is not credible without having actually examined him or her" or "the plan administrator, without any reasoning, credits the file reviewer's opinion over that of a treating physician." *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013) (citing *Bennett*, 514 F.3d at 555). The Sixth Circuit, however, has not held that questioning a claimant's credibility alone is sufficient to render a decision arbitrary and capricious. Instead, the reviewer's determination must contradict the available objective evidence. *See Bennett*, 514 F.3d at 555 (discrediting a file review after the reviewer contradicted his own conclusions, ignored record evidence, and determined the plaintiff was not credible with no physical examination). Therefore, a file review is appropriate when the reviewer reasonably relies on the available objective evidence and that evidence itself is credible.

10

In this case, Unum arbitrarily credited the file-reviewing doctors over the opinions of Dr. Kenzer, the only doctor who examined the patient. When Dr. Ju sent her preliminary opinion letter to Dr. Kenzer and asked for his rationale on any agreement, Dr. Kenzer wrote that Willard would not be able to engage in frequent reaching and exerting up to twenty pounds of force, noted that Willard is in chronic pain, and directed Dr. Ju to "[f]eel free to have the patient have a functional disability assessment by your physicians." (*Id.* at 340.) Unum argues that its failure to examine Willard was not arbitrary and capricious, because Willard had a right under the Policy to request an examination but "chose not to." *See Swanson v. Unum Life Ins. Co. of America*, No. 13-CV-4107, 2015 WL 339313 at * 8 (D. Kan. Jan. 26, 2015) ("Plaintiff apparently chose not to request an independent examination during the review of her claim; but in light of her opportunity to do so, the Court will not place great weight on Defendant's decision to rely on the medical analyses of its own onsite professionals."). While Dr. Kenzer's statement to "[f]eel free to have the patient have a functional disability assessment" did not explicitly demand an independent medical examination under the terms of the policy, it nonetheless makes clear that, to the extent Dr. Ju continued to disagree with Dr. Kenzer regarding Willard's abilities, Dr. Kenzer was communicating that a physical examination would demonstrate Willard's disability, in contrast with the results of a mere file review. By not conducting an examination thereafter and crediting its file reviewers without regard to Dr. Kenzer's disagreement based on his exam findings, Unum arbitrarily denied an examination and thus avoided additional evidence that had a reasonable likelihood of confirming Willard's disability.

Further, there was substantial objective medical evidence in the record supporting Willard's disability: (1) positive Schober's Tests confirming his condition of AS; (2) years of medical records recounting Willard's chronic pain, reaching as high as a nine out of ten in

11

severity; (3) a history of Willard's treatments becoming ineffective or only offering short-term relief; and (4) decreased range of motion in his hips and spine. (Doc. 18, at 128, 225, 606–46.) In light of this objective evidence, it was arbitrary for Unum to deny Willard's claim without an examination to further determine the severity of symptoms and extent of the disability. *See Bennett*, 514 F.3d at 555. This is especially true given Dr. Kenzer's disagreement and suggestion to have Willard examined. *See Gilrane*, No. 1:16-CV-403, 2017 WL 4018853, at *8.

### ii. Credibility Determinations & Evaluating Medical Evidence

Unum also arbitrarily determined Willard's subjective complaints were not credible and failed to rebut evidence of Willard's disability.

> "The Supreme Court [has] made clear [] that the Claims Administrator may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. And the consulting physicians hired by the Claims Administrator to review the file may not make credibility determinations concerning the claimant's subjective complaints without the benefit of a physical examination."

*Platt v. Walgreen Income Prot. Plan for Store Managers*, 455 F. Supp. 2d 734, 745 (M.D. Tenn. 2006) (internal citations omitted) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003); *Smith v. Continental Cas. Co.,* 450 F.3d 253, 262–63 (6th Cir. 2006)). Additionally, a file-reviewing doctor's opinion may be found to be arbitrary where the file-reviewing doctor ignores or fails to rebut key evidence of disability. *See, e.g.*, *Calvert*, 409 F.3d at 297.

In this case, there are numerous instances of the file-reviewing doctors discrediting Willard's subjective complaints and failing to rebut evidence of his disability. Oliver, Dr. Ju, Dr. Bress, and the appeals file-reviewing doctors all used the following rationales to determine the evidence did not support Willard's claim: (1) his treatment plan had not changed around his last day of work, (2) Dr. Kenzer had only seen Willard one other time in the six months after

12

Willard's symptoms were not worsening, and (3) he had the ability to perform activities of daily living, including driving. Each of these rationales either makes unsupported credibility determinations or fails to address or rebut evidence of Willard's disability. (Doc. 18, at 370–72; 379–80; 729–36; 739–42; 765–67.)

First, the medical management and treatment plan for Willard's condition had, in fact, changed several days before his last day of work. (*Id.* at 229.) At Willard's visit to Dr. Kenzer on March 8, 2019, Dr. Kenzer noted that Willard's pain was somewhat alleviated with his prescribed infusion of five milligrams of the drug Remicade every six weeks but that his pain was still at a six out of ten in severity. (*Id.* at 225.) At this appointment, just ten days before Willard's last day of work, Dr. Kenzer increased the dosage of Remicade to seven milligrams per infusion because his condition was not sufficiently managed at the five-milligram dosage. (*Id.* at 229.) The file-reviewing doctors relied on the rationale that Willard's medical management was stable and had not changed, so the file did not support the finding of a disability, but this rationale plainly ignores and fails to rebut the change in his medication occurring only ten days before his last day of work. (*Id.* at 370–72; 379–80; 729–36; 739–42; 765–67.) The file-reviewing doctors also reasoned that because Willard only saw Dr. Kenzer once in the six months after stopping work, the intensity of the medical management did not match the claimed disability. (*Id.*) Not only did the file-reviewing doctors fail to justify why a gap of five months between appointments would be insufficient to manage his chronic condition, but they also did not consider Willard's prescription to receive intravenous Remicade infusions every six weeks, indicating that he was receiving much more frequent treatment.

Further, the file-reviewing doctors used Willard's ability to perform activities of daily living, such as driving, doing laundry, and shopping for groceries, as evidence that he was not

13

disabled. (*Id.*) However, this rationale is based on Willard's statement to Benefits Specialist Gilliam that although he could keep up with some of those activities, driving was difficult because he could not turn his neck very well due to his condition, he could not do "anything really physical" anymore, and he had recently moved back home with his parents, who were doing most of the daily-living activities for him. (*Id.* at 130.) The file-reviewing doctors found Willard's statements about the extent of his disability to not be credible based on his ability to do activities of daily living but failed to rebut the limitations on his abilities to do those activities— the difficulty of driving, his parents covering most of the responsibilities, and his inability to do physical activities. (*See id.*) Because these rationales for denying Willard's disability failed to rebut evidence of his disability and made credibility determinations adverse to Willard without examining him, Unum's decision to deny benefits was arbitrary and capricious.[1] *See Platt*, 455 F. Supp. at 745; *Black & Decker*, 538 U.S. at 831; *Smith,* 450 F.3d at 262–63.

### iii. On the Record Before It, the Court Cannot Determine that Willard is Entitled to Benefits.

The Court finds that Unum's denial of Willard's benefits was arbitrary and capricious when the factors outlined above are considered holistically, but where the "problem is with the integrity of [the plan's] decision-making process," rather than "that [a claimant] was denied benefits to which he was clearly entitled," the appropriate remedy generally is remand to the plan

---

[1] Because the reasons discussed herein are sufficient to find Unum's decision arbitrary and capricious, the Court will not address Willard's final argument, that Unum relied exclusively on doctors in its own employ to deny his claim. However, the Court notes that the Sixth Circuit has held that "when a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism." *See Moon v. Unum Provident Corp.*, 405 F.3d 373, 382 (6th Cir. 2005) (citing *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000) (holding that a plan administrator's conflict of interest is a factor to consider when reviewing for whether the administrator's decision was arbitrary or capricious). Accordingly, the conflict of interest of the file-reviewing doctors in this case bolsters the Court's finding that Unum's decision was arbitrary and capricious.

14

administrator.  *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006).  In this case, the Court is not able to determine based on the medical records detailed above that Willard is clearly entitled to benefits.  Dr. Kenzer is the only physician who concluded that Willard was unable to work full time, and the file-reviewing doctors dispute that conclusion, albeit with insufficient reasoning.  As the Sixth Circuit has noted, the Court is not a medical specialist and therefore is not well-positioned to make medical determinations about Willard's capabilities.  *See Elliott,* 473 F.3d at 622–23.  Here, a remand will allow for a properly considered and explained determination of whether Willard is entitled to long-term disability benefits.

### III.    OBJECTION TO MAGISTRATE JUDGE'S ORDER

Also before the Court is Plaintiff's objection to United States Magistrate Judge Christopher H. Steger's amended sealing order sealing information pursuant to 28 U.S.C. § 636(b)(1)(A) and Federal Rule of Civil Procedure 72(a) (Doc. 58).  The contested sealed information is certain "Weekly Tracking Reports" Unum compiles to track disability claims.  (*See id.* at 2.)  The Court must conduct a *de novo* review of those portions of the magistrate judge's order to which objections are made and may accept, reject, or modify, in whole or in part, the magistrate judge's findings.  28 U.S.C. § 636(b)(1).  Although the Court is required to engage in a *de novo* review of specific objections, if the objections merely restate the arguments asserted in Plaintiff's earlier motion, which were addressed by the magistrate judge's order, the Court may deem those objections waived.  *See VanDiver v. Martin*, 304 F. Supp. 2d 934, 937 (E.D. Mich. 2004).  "A general objection, or one that merely restates the arguments previously presented is not sufficient to alert the court to alleged errors on the part of the magistrate judge." *Id.*  "An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an 'objection'

as that term is used in this context." *Id.*

In his objection, Willard argues that the sealing order should be reversed because: (1) it "relies exclusively on Defendants' own naked and conclusory statements of potential harm that three other courts have held were insufficient"; (2) it does not meaningfully address contrary nonbinding authority; and (3) it erroneously concludes that Unum's interests outweigh the public interest in having access to the weekly tracking reports. (Doc. 58.) The arguments were all made before and addressed by Judge Steger, and thus, amount to Willard simply disagreeing with the suggested resolution. Willard relies on cases from the U.S. District Courts for the District of Arizona and the Northern District of Alabama and California Superior Court in which those courts denied motions to seal with respect to other weekly tracking reports. (*Id.* at 6–9.) Willard had made his arguments based on these cases before Magistrate Judge Steger. (Doc. 39, at 4–7.) Magistrate Judge Steger considered these arguments and found in his amended order, "[w]hile similar information may have been placed in the public record in other cases, none of which provides binding authority, this exact information for this period of time has not. The Court will examine this information on an individual basis as it applies to this case." (Doc. 54, at 3.) These arguments merely restate those which Willard previously made and that Magistrate Judge Steger considered. *See VanDiver*, 304 F. Supp. 2d at 937. To the extent that the arguments could be construed as new, the Court finds no clear error in Magistrate Judge Steger's findings.

Willard also previously argued that Unum only provided vague and conclusory statements to support its motion to seal and that Unum's privacy interests did not outweigh the public's interest in the information. (Doc. 46, at 5–8; Doc. 39, at 4–6.) Magistrate Judge Steger considered and rejected these arguments in his amended order finding that the Weekly Tracking

16

Reports contain detailed, non-public operational and financial data which Unum takes precautions to keep private and which could be used by competitors to market their products as having better liability acceptance rates or more favorable plans. (Doc. 54, at 3.) Again, Willard's only arguments in the instant objection rehash arguments he made before Judge Steger without a reason other than disagreeing with the outcome or that he would have balanced the interests differently. (Doc. 58.) Further, to the extent Willard raises any new argument on these bases or believes that Magistrate Judge Steger's findings were still based on "vague and conclusory statements," the Court finds Magistrate Judge Steger's analysis to be based on sufficiently concrete, compelling, and detailed risks of competitive harm. Accordingly, the Court will **OVERRULE** Willard's objection to the magistrate judge order sealing information. *See VanDiver*, 304 F. Supp. 2d at 937.

## IV. MOTIONS TO SEAL, DETERMINE EXTENT OF DEFERENCE, AND TO STRIKE

Willard also filed a motion to seal a proposed motion "to determine the extent of deference" (Doc. 65). Unum filed a motion to strike the proposed motion for circumventing the Court's twenty-five-page limit on the briefing for Willard's dispositive motion (Doc. 69). Because the Court will grant Willard's motion for judgment on the administrative record without regard to these motions, the Court will **DENY** them as moot.

## V. CONCLUSION

For the reasons set forth above, Willard's motion for judgment on the administrative record (Doc. 67) is **GRANTED** to the extent that this matter is **REMANDED** to Unum for a "full and fair review" that is consistent with this memorandum and order. Willard's motion to seal its proposed motion to determine the extent of deference (Doc. 65) and Unum's motion to strike (Doc. 69) are **DENIED AS MOOT**. Willard's objection to the magistrate judge's order

(Doc. 58) sealing information is **OVERRULED**. The Clerk is **DIRECTED** to close the case.

**AN APPROPRIATE JUDGMENT SHALL ENTER.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**